162 So. 383

## REICHERT MILLING CO. v. GEORGE.
### 6 Div. 534.

Court of Appeals of Alabama.
March 27, 1934.

Rehearing Denied April 17, 1934.

Affirmed on Mandate Oct. 30, 1934.

Rehearing Granted April 16, 1935.

Rehearing Denied May 7, 1935.

Murphy, Hanna, Woodall & Lindbergh, of Birmingham, for appellant.

Fitts & Fitts and Harsh, Harsh & Hare, all of Birmingham, for appellee.

419

RICE, Justice.

Appellee's testimony tended to prove the following facts:

"That her brother purchased for her a sack of flour manufactured, sacked, and put upon the market by appellant; that said flour, in said sack, was in the same condition when procured for appellee as it was when so put upon the market by appellant; that appellee's said brother took the sack of flour immediately upon its purchase to the home of appellee; that he took down the tin flour bin—a part of appellee's 'kitchen cabinet'—from its place, thoroughly cleaned out said flour bin, including the sifter; that at the time this operation was performed there was no foreign substance of any kind in the bin; that said brother placed the bin back together and dumped the sack of flour into the bin; that he then fastened the top on the bin and the cap on the sifter; that the top was never removed from the bin, and that the cap was removed from the sifter only when appellee was sifting flour through the sifter at the bottom of the bin; that on the morning of the day after the purchase of the flour—approximately twenty four hours after it was dumped into said bin—the partially dried out body of a rat or mouse was discovered in the flour; that appellee's brother who bought and emptied up the said flour observed same when it was so emptied up—to so denominate dumping it into the flour bin—and that he saw no rat or other foreign substance in said flour at that time."

While the above statement, taken with enough literalness, we think, to justify the quotation marks, from the excellent brief filed here on behalf of appellee, is, we believe, fully borne out by the bill of exceptions, still we feel that it should be observed that a part of the testimony supporting same consisted of the bald statement—allowed without objection—of her witnesses that the "flour bin" was not opened during the approximately twenty-four hours, above mentioned, when the testimony conclusively showed that the cabinet, containing the bin, stood in the kitchen of the home of appellee, where she and three others lived and spent the night that elapsed, if not in bed asleep, at least not in the kitchen guarding, or in view of said cabinet and bin. Such testimony, as to facts about which the witness obviously, and physically, could not know, has been denominated somewhere in the books a "testimonial nonentity." But we will not bother about that phase of it here; we will treat the case as though this part of appellee's claim had been properly adduced in the testimony.

The pertinency of the remarks contained in the preceding paragraph is, we think, sufficiently shown by the further observation that at least one of the occupants of appellee's home, who ate dinner, supper, and breakfast there, after the morning upon which the flour was dumped into the bin, and before the alleged "rat" was discovered in the flour, and who spent the night there, was not examined as a witness upon the trial. What *he* did to the bin is left a matter of conjecture.

In all that has gone hereinbefore we have endeavored to give a full and fair picture of the case as shown by the testimony, in its most favorable aspects toward appellee's claim.

Upon this testimony we are of the opinion, and hold, that appellant should have had given to the jury, at its request, the general affirmative charge, duly requested, to find in its favor. We will state our reasons.

In the first place we would record that we are well aware that a "manufacturer is liable to third persons having no contractual relations with him for negligence in manufacture of articles of dangerous or obnoxious character." Collins Baking Co. v. Savage, 227 Ala. 408, 150 So. 336. And that the claim advanced by appellee, here, falls within the purview of this principle of the law—had her testimony supported her claim.

But it is just as firmly fixed in our law that "the liability of a manufacturer of

soft drinks intended for human consumption to a purchaser from an intermediate dealer, who was made sick by consuming a drink unfit for such consumption, is founded on tort, and not on contract, so that the consumer cannot recover *without showing the manufacturer's negligence.*" (Italics ours.) Birmingham Chero-Cola Bottling Co. v. Clark, 205 Ala. 678, 89 So. 64, 17 A. L. R. 667. This principle applies in its full force to the facts of this case; unless the testimony *legitimately* tends to show negligence on the part of appellant in manufacturing, sacking, and putting upon the market the flour in question, there can be no recovery. Collins Baking Co. v. Savage, supra.

Our Supreme Court has said: "The presence of foreign matter deleterious to health sealed up in a bottle of soft drink *is evidence* of negligence." (Italics ours.) Coca-Cola Bottling Co. v. Crook, 222 Ala. 369, 132 So. 898. Accordingly, there being no difference in principle, in this case, if the alleged "rat," etc., found by appellee on the day after the day on which the flour was "dumped into" her flour bin, was *in the sack of flour* purchased, etc., for her, shown to have been manufactured, etc., by appellant, there can be no question that this *fact* was *evidence* of negligence on the part of appellant. Not *negligence* as a matter of law; but *evidence of negligence,* from which the jury could have *inferred* negligence as a matter of law. Whistle Bottling Co. v. Searson, 207 Ala. 387, 92 So. 657.

Now *was* the "rat" *in* the sack of flour when it was purchased?

Obviously, from the statement hereinabove, the jury might well have so *inferred.* But as we read the testimony it could have so found *only* by inference.

Hereinabove we have stated the gist, favorable to appellee's contention, of the whole testimony. From it, without further discussion, we think it obvious that there was no "direct testimony" to the fact that the "rat" was in the sack of flour when it was purchased for appellee.

We are then confronted with the proposition of appellee's asking a recovery because of the negligence of appellant, which negligence is attempted to be established upon *two* inferences: First, the inference that the "rat" was *in* the sack of flour when it was purchased, for appellee; and, second, the inference from *this* fact that appellant was negligent in the manufacture, etc., of the said sack of flour. In other words, as we view it, an "inference upon an inference."

Our Supreme Court has distinctly stated that: "One fact cannot be inferred from another fact which itself is but an inference." Gadsden General Hospital v. Bishop, 209 Ala. 272, 96 So. 145, 148. Here, the *fact,* upon which appellee's right to recovery depends is the *negligence* of appellant; the *fact* from which, and from which, only, it can be *inferred,* is the presence *in* the sack of flour, at the time of its purchase of the "rat". Its said presence is not established, nor even indicated, by any *direct,* as contradistinguished from *circumstantial,* evidence.

As stated in 10 Ruling Case Law at page 870 (§ 13), and cited with approval by our Supreme Court (Atlantic Coast Line R. Co. v. R. L. Cooper Lumber Co., 219 Ala. 484, 122 So. 661): "It is a well-established rule that a presumption can be legally indulged only when the facts from which the presumption arises are proved by direct evidence, and that one presumption cannot be deduced from another. To hold that a fact inferred or presumed at once becomes an established fact, for the purpose of serving as a base for a further inference or presumption, would be to spin out the chain of presumptions into the regions of the barest conjecture."

What is meant by the next above quotation, and making it, we think, very clear, and supporting its assertion, is detailed in the opinion in the case of Globe Accident Insurance Company v. Gerisch, 163 Ill. 625, 45 N. E. 563, 54 Am. St. Rep. 486, which we will not prolong our opinion to discuss.

Since there is a well-defined difference between "direct" and "circumstantial" evidence (10 R. C. L. 860), it might seem that prior to the time of the writing of the opinion in the case of Atlantic Coast Line R. Co. v. R. L. Cooper Lumber Co., supra, when proof of negligence depended upon an "inference," the fact used as a basis of the inference must have been "proved by *direct* evidence." 10 R. C. L. 870, supra.

Just how that is, now, in the light of the expression used by the Supreme Court in the said Atlantic Coast Line R. Co. v. R. L. Cooper Lumber Co. Case, supra, to wit, "The fact used as the basis of the inference, the *terminus a quo,* so to speak, must be *established in a clear manner, devoid of uncertainty*" (italics ours), we

need not stop to inquire. Because, here, by reason of the fact that one, at least, of the occupants of appellee's home, who had full access to the cabinet and flour bin for practically the whole period of approximately twenty-four hours between the time the flour was placed in said bin and the time of the discovery of the "rat" in said flour is not shown to have not placed the "rat" in said flour.

Of course, we do not mean to intimate that he *did* any such thing; but we are merely trying to make clear why it appears to us that the testimony fails to meet the test—either that quoted from 10 R. C. L., above, or that quoted from the opinion by the Supreme Court in the Atlantic Coast Line R. Co. v. R. L. Cooper Lumber Company Case, supra—if, indeed, there is a difference in said tests.

We realize that what we have written hereinabove is not consistent with some of the language used by us in the opinion in the case of Buffalo Rock Bottling Co. v. Stephenson, 22 Ala. App. 605, 118 So. 498. But our province is a strictly limited one (Code 1923, § 7318); and our views, here, are our best judgment of what they should be to conform to the holdings of our Supreme Court. Those expressed in the opinion in the Buffalo Rock, etc., Case just cited are modified to conform hereto.

For the error in refusing to give to the jury at appellant's request the general affirmative charge to find in its favor, the judgment is reversed and the cause remanded.

Reversed and remanded.

## On Rehearing.

### PER CURIAM.

Appellant insists, as it has the right to do, that its assignments of error entered upon the record and duly argued be considered, and directs our attention to the fact this court in its former opinion failed to note and consider several assignments duly made and argued, and, upon which (together with those discussed and decided) it relies for a reversal of the judgment from which this appeal was taken.

Appellant is correct in its statement in this connection. However, our reason for not discussing each of the assignments of error in our former opinion is obvious. This court was unanimous in the conclusion (and so declared) that upon a consideration of all the evidence adduced upon the trial below the defendant was entitled to a directed verdict and that the court erred in declining to give the affirmative charge in its behalf. After having so determined, we saw no good reason to go further and discuss in detail the remaining assignments as not being necessary and could add nothing to the conclusion reached.

On certiorari to the Supreme Court of this case, that court by a divided opinion granted the writ, the majority holding: "The facts, as found by the Court of Appeals, support a fair and reasonable inference, to say the least of it, that the flour manufactured and sacked by the defendant, and sold to the plaintiff at a retail store, contained in the flour so sacked and sold, at the time it was placed on the market by the defendant, the body of a 'rat or mouse.' While there was in this case no direct evidence of the above facts, yet the circumstances detailed in evidence were such as to afford a reasonable inference that such was the case." And in said majority opinion, the elementary proposition was stated to the effect: "The general charge should never be given when the evidence is such as to reasonably support an inference adverse to the party requesting such charge."

Under section 7318 of the Code 1923, the decisions of the Supreme Court shall govern the holdings and decisions of this court. And under the provisions of section 10273 of the Code 1923, the majority opinion of the Supreme Court, when there is dissent, shall control. Accordingly, this court, in the instant case, must accord to the majority opinion of the Supreme Court, supra. We are free to state, however, it was not our intention to state the facts of this case in our former opinion so as to warrant the construction placed thereon by the majority opinion. The able dissenting opinion of Mr. Justice BROWN, concurred in by the Chief Justice, is in accord with the statement of facts and views as was our intention to state and to hold.

On this rehearing we have given further attentive consideration to the numerous points of decision, duly presented, and have reached the conclusion that error prevailed in the ruling of the court in denying defendant's motion for a new trial. The motion for a new trial was based upon numerous grounds, many of

which appear to us to have been well taken. In said motion practically every material insistence of appellant is presented. We deem a discussion of these points of decision will suffice in this opinion. We are clearly of the opinion that the verdict rendered was contrary to the great weight of the evidence in this case. In this connection we quote from the record the following facts as to which there is no dispute in the evidence.

That the Great Atlantic & Pacific Tea Company at the time and before the occasion complained of in the complaint was engaged in the retail grocery business with a store at Powderly, Jefferson county, Ala., and in that way engaged in selling flour known as Sunnyfield Self Rising Flour, which came to the Great Atlantic & Pacific Tea Company from the defendant, Reichert Milling Company, a corporation, in bags or sacks already packed, and in which form the flour was sold at retail alone by the Great Atlantic & Pacific Tea Company; it was admitted by the defendant, Reichert Milling Company, a corporation, that, "since about July 1, 1932, said defendant did manufacture and sell in car lots to the Great Atlantic & Pacific Tea Company a grade of flour branded Sunnyfield Self Rising, but said defendant does not know what disposition the A. & P. Tea Company has made of any such flour"; that in no other wise did the defendant, Reichert Milling Company, a corporation, engage in selling the alleged flour. W. J. Reichert testifying for the said defendant said: "I have been in the flour milling business more than 45 years; since I was 18 years old. My plant is at Freeburg, Sinclair County, Illinois. The character of the machinery that I use and the labor that I have engaged in the manufacture and packing of flour, up to the 17th of August, 1932, was of the very best."

Defendant's witness, J. L. Griggs, testifying said:

"My name is J. L. Griggs, and I am Secretary of the Southern Illinois Millers Association. I live at Sparta, Illinois. I have been secretary of this organization thirty-one years. My function is to look after the interests of the millers on legal, railroad and other matters connected with the industry that we have which is necessary to look after from time to time as they come up. I am familiar with the best machinery used in the country in the manufacture and packing of flour. I know the machinery so used by the Reichert Milling Company, and so used before the 17th of August last year. I have been in that plant quite frequently. I know Mr. Reichert very well. He is the gentlemen sitting to the left of Mr. Woodall. I went into the milling business myself about the same time he did, and I think that was thirty-five years ago. I owned a mill myself about the same time of about the same size and same capacity, built the same way, a roller process mill of the new style, what is now known as modern milling. His family had been in the milling game, and his brother and others, and when they departed he took it up personally and organized a corporation. He is the principal owner of that corporation.

"I knew the character of manufacture and packing of self-rising flour by the Reichert Milling Company as of and up to August 17, 1932. I think their equipment is the finest that money can buy. I think it was assembled under some of the best technicians, and the millers understanding of Mr. Reichert's plant is one of the finest mills in the country. He knows manufacturing and the milling end of the game as well as any man in the United States."

Defendant's witness, J. M. Rauch, stated that he lived at Belleville, Ill., and that he had been connected with the defendant, Reichert Milling Company, a corporation, for several years in the capacity of correspondent office manager and sales manager, but at the time he was testifying he was not connected with the defendant. His testimony shows that he was thoroughly familiar with the ingredients, mixing, manufacture, packing, and wholesale distribution of the self-rising flour handled by the defendant, Reichert Milling Company, and sold by it in sacks by the carload lots to the Atlantic & Pacific Tea Company in Birmingham, Ala., for the last company's retail business. He stated that he had been in the flour milling business as owner and operator for twenty-eight years and was familiar with the very best type of flour milling used in the United States, and that his familiarity with the mechanism of the manufacture and packing of flour was from opportunities for observation that he had had of the process used and examination of the mill and system used and method of manufacture. He stated: "I am fa-

miliar with this plant of the Reichert Milling Company as used in the business prior to August 17, 1932. * * * It has been in business as it is now built from about the year 1900 or possibly a little earlier, I can't give the exact date. I came with the business in 1931 as Sales Manager, Office Manager and Correspondent."

His testimony then in detail describes the ingredients of the defendant's brand of flour known as Sunnyfield Self Rising, and the manufacture, mixing, and handling of said flour from the time that the wheat grain was being prepared for milling and on through the time when it was as flour packed in sacks sewed up and stored for shipping and shipped in carload lots for sale to the retail purchasers. He described in detail the machinery, plant, and labor for this manufacturing, mixing, packing, storing, and shipping of the flour. His testimony shows without dispute that the machinery, labor, and also the method of handling the flour sacks, used in the manufacture, mixing, and packing of the flour into sacks sewed up, was such as to make the performance continuous through closed and screened machinery, and bolting silk, and such as to make it not reasonably possible or probable for any foreign substance, such as a rat or mouse, to be contained in the sack of flour as packed and sewed up in the defendant's plant. This testimony shows without dispute that the sacks into which this flour was packed were so tightly compressed into bales and instantly and carefully handled in receiving the flour therein, so as that no reasonable possibility or probability existed for the presence of any foreign substance, such as a rat or mouse, to gain entrance into the sack of flour as packed and sewed up. This testimony further shows without dispute that defendant's plant was always kept free of dust, dirt, refuse, or the presence of rats or mice, both in the storage room where were kept the compressed bales of sacks, and in the manufacturing, mixing, and packing room of the flour, and in the warehouse where the packed flour was stored before shipment, and in the railroad cars where the sacked flour was placed for the wholesale shipment to retailers.

The record further shows the following undisputed evidence:

That plaintiff's brother, E. M. McCain, purchased the alleged sack of flour for the plaintiff from the retail store of Atlantic & Pacific Tea Company at Powderly, Jefferson county, Ala., and that he carried the flour from the store to the plaintiff's home, and that "there was no hole of any kind in it, rat hole or any other kind of hole." Plaintiff's brother, E. M. McCain, alone handled the sack of flour from the time it was taken from the store until it was put in the flour bin in the kitchen cabinet at the plaintiff's home. This witness, E. M. McCain, was the only person who looked into the flour bin or had anything to do with cleaning the flour bin, or putting the flour in the flour bin.

The plaintiff testified concerning her witness and brother, E. M. McCain, in his cleaning of the flour bin and emptying the sack into it, as follows: "He taken it all apart and cleaned it out. * * * I did not look in the bin. When he finished that he took it and put it back in the cabinet and emptied the flour in the bin."

The evidence shows the only other person present at the time of placing the flour in the bin was the plaintiff's sister and witness, Mrs. B. L. Pitchford, who said: "But I saw him cleaning it out. I don't know whether he took all the pieces out or not. I did not look in the bin. I just saw him doing that."

The witness, E. M. McCain, testified for the plaintiff as follows: "So I taken it down and taken the sifter off the bottom of it and taken a cloth and wiped it out. I looked in the bin at that time. * * * There wasn't a rat or mouse in the bin. * * * Then I put the bin back together, that is, put the sifter on it, and put it back up in the place, and unraveled the sack of flour, and then picked the sack up and dumped it right over in there like everybody else does."

This witness further testified: "When I opened the sack of flour I did not see anything on top of it. The flour was white. I did not see anything wrong with it when I unraveled it. * * * I saw the top of the flour in the sack after I unraveled it. There was no rat on top of it. I saw the flour after I put it in the bin. There was no rat on top of it after I put it in the bin. If there was any rat in the sack when I put it in the bin, it wasn't on top and wasn't on the bottom of the sack."

He further testified that: "There was nothing wrong with the sack, no rat hole in it. I didn't pay any attention to the smell of it when I poured it in there. I did not see any rat as I poured it in."

This witness for the plaintiff, E. M. McCain, was shown by the undisputed evidence in the case to be a man of poor recollection and memory. He testified: "My recollection is not good. I don't know what is wrong with it. I just don't remember things. I reckon I have been afflicted that way all my life. I can remember things two or three days, or a week, or maybe a month or two."

Said witness' sister, Mrs. B. L. Pitchford, and witness for the plaintiff, testified: "My brother can't remember good. He never could remember so good."

E. M. McCain, witness and brother of the plaintiff, testified further, speaking of the flour bin into which the flour was emptied: "This thing sits in the kitchen cabinet like this. * * * There is a place in the cabinet for it to go in here. This part of the cabinet is wood. It is in the kitchen at the house. There is no pantry in the kitchen. The cabinet sits right by the side of the stove. * * * We still have our cat. * * * I have seen the cat catch rats. I have never seen the cat catch rats in the kitchen, but I have seen her catch one on the outside of the house, out in the yard in the rabbit pen. We keep rabbits too."

This witness further testified for the plaintiff that on the 17th day of August he purchased the alleged sack of flour and carried it to the plaintiff's home, and emptied it into the flour bin and further said: "I learned that a rat had been discovered in the flour on the 18th. * * * I found out about it on the 18th. * * * It was before I went for the doctor. Before the doctor got up there I had found out that my sister had found a rat in the flour. I hadn't eaten dinner then. I went down and got the doctor and brought him up there and talked about the rat being in the flour and I went ahead and ate dinner, but I didn't eat that bread made out of that flour."

He further testified:

"The first I saw of the rat was after it had been poured back into a dishpan, and my sister had told me that in undertaking to grind this thing that it hung up on her. She had taken this off here and poured it out this way. She poured the rat and flour out into the dishpan. I did not see her pour it out.

"The body of the mouse was discovered in about the middle of the flour about 10:30 A. M., on August 18th when my sister, Mrs. Irene George, got out some flour to make some biscuits. * * * She had already cooked breakfast that morning. She was up cooking dinner again at 10:30. * * * My sister told me that she discovered the mouse."

Plaintiff's witness and her sister, Mrs. Pitchford, testified that the first she had heard of the rat was when her brother, E. M. McCain, went to get the doctor for the plaintiff and to report the matter to Mr. Jordan at the Atlantic & Pacific Tea Company, where the sack of flour was purchased, and that her brother, E. M. McCain, came to her house and told her about it and then went and got the doctor and Mr. Jordan, both of whom, so the record shows, came to the plaintiff's house shortly after Mrs. Pitchford got to the plaintiff's house.

E. M. McCain further testified:

"A man from the Atlantic and Pacific people came down there, and there were a number of people came to look at the rat.

"It did not look like a rat until they put water on it. * * * The water washed the flour off of it. When they put the water to it, it was just like washing a dirty rag or anything, it washed the flour off the rat; any fool would know that. You couldn't tell it was a rat before they put the water to it. * * * Alvin (who was plaintiff's son) carried it down to the City Laboratory. * * * I don't know how long the rat was at the City Laboratory. It was there a few days. * * * I have had the rat in my possession since it came back from the City Laboratory."

The record fails to show any report from the city laboratory as to the alleged rat.

The testimony of the plaintiff was that in grinding the flour through the sifter from the flour bin in order to get flour for making into dough for baking into bread for dinner the plaintiff discovered a substance in the sifter which hung up the sifter and that she took the sifter off the flour bin, and discovered the foreign substance which she claimed to be a rat or mouse; that she ate supper the night before and breakfast on the morning when she discovered the alleged rat, and each time ate of flour baked into bread, which was taken from the flour bin; that she was made sick during the night before, but had eaten breakfast afterwards and was en-

gaged in preparing dinner for herself and her brother when she discovered this foreign substance in the flour bin; that the doctor was not called to see her until after this discovery. She said: "I answered to the interrogatories propounded to me that I was not totally confined to my bed at any time but was forced to go to bed off and on for a period of several weeks. I couldn't stay in bed all the time."

The plaintiff testified:

"Mr. Jordan (who was the A. & P. man) came up there before the doctor did.

"I cooked the meal in the morning of the 18th, but the dinner on the 18th was not finished. I stopped when I found the rat. * * * My brother was still there, but the boys had gone to work. My brother and I were going to have dinner. We were going to have more biscuits. I was going to use this flour for bread, and went there and found this rat, and that threw me and I couldn't go any further."

Plaintiff's witness and brother, E. M. McCain, testified: "The rat got hung in this part of the sifter here. I can't get this part off, but it is supposed to come off. That is a brand new sifter in the bottom of it now. She put a new sifter in it right after that, right after the rat got hung in it. * * * This part of the bin that I now find difficulty in removing is where my sister said she found the mouse. I did not have to have a knife to take it off that day. * * * We put a new sifter in there to bring up here. We have not used it since this happened. * * * I am still trying to get this cap off, and have my handkerchief and knife out, but can't get it off with those tools, it is stuck on there."

The plaintiff's sister and witness, Mrs. Pitchford, testified that her daughter worked for Dr. A. E. Wilkes and had worked for him "since January first, and then she worked about a year before that, or a year and a half. Dr. Wilkes has been the family physician for my sister ever since she has been in Powderly, which has been ten or twelve years or more."

Dr. A. E. Wilkes, the plaintiff's witness, testified: "I got my medical training at the University of Alabama when it was located at the Hillman Hospital, years ago. * * * Since that time I have been practicing at Powderly in a general practice, and have been the family physician of Mrs. George and her family over a period of some eight or twelve years.

Her niece, Miss Pitchford, works for me in my office now, and has since in January. She worked there once before for about nine months. * * * Mrs. George was not sick in bed when I got there on the 18th; she was sitting in a rocking chair. She was not even undressed. * * * I say I don't know what that toxin was. I know in a general way how to treat it."

Defendant's witness, Dr. H. P. Hanna, testified that he was a practicing physician and had been such since 1912, and among other things he testified as follows: "I am a practicing physician, and have been since 1912. My work is general medicine, pediatrics, obstetrics and minor surgery. As to my experience in chemistry, I have had high school work, and my work during my medical training, all branches of chemistry from the elementary to the highest standards with which we have to go into for examinations, of all the secretions of the body as well as the elements of the body. In my opinion the cooking of flour that contained a dead mouse of some duration, to the point that the head was partly gone, eyes were gone, it was dried out and dark brown, where that flour was a self rising flour composed of four ingredients, wheat ground up such as suitable for flour, phosphate, soda and salt, if there were any poison in the flour in its raw condition under those circumstances, the cooking of it into biscuits would destroy any living organism that would be present, in my opinion. In the cooking of biscuits the temperature is usually very high. I have had experience with food poisoning. That is a germ trouble; we call them ptomaines. They are germs. We have conditions that are a toxic poisoning and yet not a germ poisoning. In a case where a woman is pregnant and the baby should die, there are certain times following the death of this feotus or child that there is a toxemia that is thrown off from this dead matter, or dead child, and she will get a toxemia; that is one illustration. We do not have anything like that in a food poisoning. Germs are destroyed by heat. As to whether the mixture of phosphate, soda and salt, would tend to the further destruction of germs when heat is applied, I would say that soda is a very mild antiseptic ordinarily, cooking soda is, but I don't know that there would be very much material difference. It would be in this way, that soda would prevent some fermentation, because if there was the possibil-

ity of an acid organism or ptomaine there would be present, the presence of the carbohydrate there, which was an alkali, would neutralize any toxin that would be thrown off by the acid organism or germ. The extent of that, however, I don't know, because the proportion of the soda I don't know, and the proportion of the toxemia I don't know or the type of toxemia I don't know. * * * Of course, a dead animal always throws off an odor that is characteristic, and anyone smells a dead rat, but that odor usually passes, I would say the limit would be in five days. And I should say that the same would exist if it was packed in flour, that the absorption would take place in flour of the moisture that the dead animal would throw off, and I should think the limit would be five days before it was completely gone. Now, that is the animal tissues that would give this odor. If a live rat were caught in there in the process of manufacturing, caught in this sack and packed in there, I would say it would be approximately five days before that odor would be eliminated and absorbed. I think there would be a decaying of the animal material in approximately five days. You would find the shell or skin, and probably the teeth and feet, and maybe the tail, as that is not absorbed as readily as the soft tissues are, we call it, or inside of the rat. In my opinion as a doctor and chemist, I can't see why the absorption of a rat in a sack of flour like that, leaving merely the shell, would poison that flour. In my opinion, in cooking that self rising flour into biscuits, the heat would destroy any organism that would be present at that time."

On cross-examination this witness testified as follows: "In my opinion heat would destroy any toxemia bacteria that was thrown off by the decaying or decomposing body of a rat or mouse. In my opinion it would be destroyed in the preparation or cooking, following the cooking. I am just giving my opinion."

The foregoing evidence, and the deductions to be drawn therefrom, in our opinion clearly sustains grounds 2, 3, 4, 5, 6, and 7 of defendant's motion for a new trial. Said evidence, without dispute or conflict, tended to show that the defendant manufacturer in the process of manufacturing, packing, storing, and distributing this flour used that highest degree of care exercised by the best millers, both as to machinery, equipment, and labor; and this we think was ample to overcome the rebuttable presumption of negligence on the part of the manufacturer, raised by the circumstantial inference produced by the vague and unsatisfactory testimony of the plaintiff and her witness.

Grounds 8 and 9 of the motion must be sustained also. The plaintiff in this case, if entitled to recover at all, such recovery would be in the nature of a compensation. In other words, in no event would plaintiff be entitled to punitive damages, and it appearing that the amount of recovery was grossly in excess of her right in the way of compensation as shown by the testimony, the judgment rendered upon the verdict should have been set aside for this reason.

We are of the opinion that ground 10 of the motion for a new trial presents an unimportant matter and therefore should not prevail. The question propounded was preliminary in its nature and defendant suffered no injury from the reply of the witness.

The same applies to grounds 11 and 12 of the motion. The matter involved in this connection is of no material moment.

Ground 12A of the motion presents the question of the voluntary statement of plaintiff, "Mr. Poole acted nice, but a Jew came down there that did not." In this connection counsel for appellant has this to say: "We call the court's attention to the great prejudice injected into this case by the plaintiff and by her counsel, while she was testifying, and while he was arguing to the jury, all as pointed out by assignments of error 8, 9, 10, 11 and 12, separately and severally. First, as to assignment of error 8 there was no occasion at all under the sun for the plaintiff bringing into the case an issue of race prejudice as she did by mentioning, without any warrant therefor, the fact that a Jew came down there who did not act nice, while the defendant's principal stockholder was at that moment sitting in court in the presence of her and the jury aiding in the defense of this suit and who appeared to be a Jew. * * * The Supreme Court of Alabama has spoken on this subject very decidedly in the case of Loeb v. Webster [213 Ala. 99, 104 So. 25, 27] supra, wherein the court speaking through Mr. Justice Gardner, has to say as reasons why a new trial should be ordered in the case: 'This court has frequently held an appeal to

race prejudice constitutes a most serious breach of the privilege of argument to the jury, and such appeals have met with frequent condemnation by this court. Tannehill v. State, 159 Ala. 51, 48 So. 662; Anderson v. State, 209 Ala. 36, 95 So. 171; Moulton v. State, 199 Ala. 411, 74 So. 454. We see no occasion for any race question to have been injected into the statement of the case, nor justification therefor, and we will assume that as a matter of course this question will not again arise upon another trial of the cause.'"

As to ground 12B of the motion, appellant insists: "The argument of counsel for the plaintiff poisoned the jury equally as well as shown by the assignments of error mentioned, in first contrasting between the plaintiff as a poor ·person and the defendant as a rich person, contrasting between the plaintiff as a resident of this State and the defendant as a non-resident and a corporation at that, and next insisting that it is only by good luck that the plaintiff, who was not able to get out of the State of Alabama because of her poverty caught the defendant in this jurisdiction and could thereby try her case here. Then, to sum it up the counsel argues to the jury that no small amount of money would be satisfactory and to give the case to the defendant unless very substantial damages were awarded to the plaintiff, which climax of his argument follows as of course, having stressed the difference in wealth and residency of the parties. This argument was ineradicable from the jury's minds."

This court is of the opinion that the subject-matter of the foregoing insistence might have unduly prejudiced the jury against the defendant, and that in its action or ruling on the motion for a new trial, the court below should have given careful and serious consideration to these questions and granted the motion in order that justice might prevail. The foregoing is sustained by the following authorities: Pryor v. Limestone County, 225 Ala. 540, 144 So. 18; Birmingham Electric Co. v. Ryder, 225 Ala. 369, 144 So. 18; Metropolitan Life Ins. Co. v. Carter, 212 Ala. 212, 102 So. 130; Standridge v. Martin, 203 Ala. 486, 84 So. 266.

Grounds 13 and 14 of the motion for a new trial are predicated upon the court's rulings in connection with the testimony of plaintiff's witness, Dr. A. E.

Wilkes. The witness does not appear to have been properly qualified as an expert, hence his testimony was based upon his conclusions and was invasive of the province of the jury.

The foregoing, we think, is conclusive. The opinion heretofore rendered by this court, "after remandment," is withdrawn. This opinion is substituted; and, as stated, for the error of the trial court in overruling defendant's motion for a new trial, the judgment from which this appeal was taken is reversed and the cause is remanded.

Opinion substituted.

Reversed and remanded.

RICE, Justice (dissenting).

The reason I cannot agree that the verdict was contrary to the weight of the evidence is that our Supreme Court used this language in discussing a case involving the same controlling legal principle as the one concerned here, to wit: "The full evidence as to the modern equipment of the plant and the details of operation, including inspection both before and after filling the bottle, serve rather to emphasize than to disprove negligence of some employee in passing into the market a bottle containing the articles disclosed in the evidence." Try-Me Beverage Co. et al. v. Harris, 217 Ala. 302, 116 So. 147, 148; Code 1923, § 7318.

When this case was remanded to us by the Supreme Court, I prepared for this court and, after due consideration, there was adopted by this court the following opinion, to wit:

"Opinion After Remandment.

"RICE, Justice.

"We thought what we wrote in our original opinion was decisive of this appeal. So we stood by it, and on it.

"But, we understand from the majority opinion of the Supreme Court that—her testimony tending to show that appellee suffered injuries from eating bread made of the flour described in our other opinion —the question of appellant's liability vel non as for negligence was one to be decided by the jury. Code 1923, § 7318; Const. 1901, § 140.

"We therefore proceed to inquire— which, obviously, was unnecessary, if not improper, under the views controlling our original opinion—whether or not prejudi-

428

cially erroneous rulings, other than the one treated by us therein—properly presented for our review—occurred on the trial of the case in the court below.

"We are persuaded that a detailed treatment of the assignments of error based on the other rulings complained of is not required. It is not our purpose to dispose of the case in such a way as to preclude appellant's having our decision on the questions presented reviewed by the Supreme Court; so we state that we have carefully examined each assignment of error shown by appellant's brief on original submission to have been insisted upon in the way prescribed by the rules and holdings by our Supreme Court (Futvoye et al. v. Chuites et al., 224 Ala. 458, 140 So. 432), and that, while we do not say that no error infected any such ruling (other than the ruling of the trial court whereby appellant's motion for a new trial was denied), yet we do say that no prejudicial error infected same. In other words, in the light of the opinion by the majority of the Supreme Court on certiorari, we cannot say that any one or all of such rulings, even if technically erroneous, in our opinion 'after an examination of the entire cause * * * has probably injuriously affected substantial rights of the (appellant).' Hence, under the express terms of Supreme Court rule 45, we are not allowed to order a reversal of the judgment on account thereof.

"As for the action of the trial court in overruling appellant's motion to set aside the verdict and grant to it a new trial, we observe that the case was tried before a special judge—a learned member of the bar—literally of appellant's own selection —it agreeing that he should try the case.

"Much of the testimony on behalf of appellee was subject to the criticism leveled at it by appellant in this court—and, we doubt not, in the lower court. But, such as it was, it was full, copious, and ample.

"The learned trial judge saw and heard the witnesses; saw and heard the things so loudly derided here—the confusion, the inconsistencies, the eagerness, and what not. He denied appellant's motion.

"We do not see, the law being as deducible from the holding by the majority of the Supreme Court on certiorari, upon what principle we might hold the said action of said judge erroneous. We refuse to so hold.

"It results, there being no ruling of a prejudicially erroneous nature presented to us, the judgment is affirmed.

"Affirmed."

The above opinion, though now withdrawn by my associates, still expresses my views.

I, therefore, beg to dissent.